**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT SELLERS, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LATTICE SEMICONDUCTOR CORPORATION, DARIN G. BILLERBECK, JOHN E. BOURGOIN, ROBIN A. ABRAMS, ROBERT R. HERB, BRIAN M. BEATTIE, MARK E. JENSEN, DAVID J. RICHARDSON, and FREDERICK D. WEBER,<br><br>Defendants. | **C.A. No. ______________**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Robert Sellers ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his own acts, which is alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1. This is a stockholder class action brought by Plaintiff on behalf of holders of the common stock of Lattice Semiconductor Corporation ("Lattice" or the "Company") against the Company and its board of directors (the "Board") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder in connection with the proposed acquisition of Lattice by a newly-created private

equity firm, Canyon Bridge Capital Partners, LLC ("Canyon")[1] through a merger, as detailed herein set for shareholder vote on February 28, 2017 (the "Proposed Transaction").

2. On November 3, 2016, Lattice and Canyon jointly announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") whereby Merger Sub (see footnote 1) will be merged with and into Lattice, with Lattice continuing on as a wholly-owned subsidiary of Canyon. Pursuant to the Merger, each issued and outstanding share of Lattice common stock will be cancelled and automatically converted into the right to receive $8.30 in cash ("Merger Consideration"). The Proposed Transaction is valued at approximately $1.3 billion.

3. Defendants (defined below) violated the above-referenced sections of the Exchange Act, and rules and regulations promulgated by the U.S. Securities and Exchange Commission ("SEC"), by filing a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC on January 27, 2017. The Proxy recommends that Lattice stockholders exchange their shares pursuant to the terms of the Merger Agreement based

---

[1] The merger will be effected through newly-created acquisition vehicles Canyon Bridge Acquisition Company, Inc. (referred to as "Parent" in the Merger Agreement), and Canyon Bridge Merger Sub, Inc. ("Merger Sub"), a wholly-owned subsidiary of Parent, which will merge with Lattice. Parent is owned by Canyon Bridge Fund I, LP, an investment fund affiliated with Canyon (the Merger Agreement refers to Canyon as CBC Partners). Canyon was formed for purposes of acquiring Lattice by Ben Chow and Ray Bingham. Canyon has one limited partner, a wholly-owned subsidiary of China Venture Capital Fun Corporation Limited, a large Chinese investment fund. The Proposed Transaction with Lattice is Canyon's first investment. Ray Bingham is a well-known Silicon Valley entrepreneur and investor who is currently chairman of Cypress Semiconductor Corp. Ben Chow worked in the China operations of the private-equity firm Warburg Pincus and more recently was managing director of China Reform Fund Management Ltd., according to Canyon Bridge's website. www.wsj.com/articles/lattice-semiconductor-to-sell-itself-to-canyon-bridge-for-1-3-billion-1478177494. The Proposed Transaction naturally must be approved by the Committee on Foreign Investment in the U.S ("CFIUS"). Due to the obtuse structure of this transaction and for convenience, Plaintiff refers to the Canyon acquisition entities as "Canyon" where appropriate.

among other things on the opinion rendered by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") and other internal and external factors the Lattice Board purportedly considered to make the recommendation.

4. The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Lattice's public stockholders. The Company, a fabless manufacturer, has been a darling of Silicon Valley due to innovative technology including low-power field-programmable gate array technology ("FGPA"), and its stock price, had reflected positive operational and financial results trading above the Merger Consideration in 2014. Although the Company has hit headwinds, as have many chip manufacturers, it has reported positive results reflecting a turn-around strategy. For the fiscal third quarter ended October 1, 2016, the Company reported revenue of $113.2 million, which increased 14.1% compared to revenue of $99.2 million for the second quarter 2016, and increased 3.2%, compared to the third quarter 2015 revenue of $109.7 million on a Generally Accepted Accounting Principles ("GAAP") basis.[2] Although the Company reported a net GAAP loss of $12.4 million, this was a decrease from $13.8 million net GAAP losses in the prior quarter. As the Individual Defendant Billerbeck stated in the Company's press release, "Our growth remains on track as we execute on our second half ramp, our R&D roadmap and the strategic initiatives that will help ensure our longer-term success. We achieved a 23% gain in FPGA revenue and continued growth in the overall consumer market. Better than expected manufacturing efficiencies combined with a favorable product mix in the quarter enabled us to

---

[2] Lattice closed its acquisition of Silicon Image on March 10, 2015.

deliver a 59.5% gross margin, which was well above our guidance."[3] At bottom, the Board should have obtained a much higher transaction premium for Lattice stockholders.[4]

5. Importantly, from Canyon's perspective, Lattice represents a large and strategic foothold in the established and lucrative U.S. chip maker industry. Indeed, Messrs. Chow and Bingham, knowing full well of Lattice's long-term plan to improve operations and new contract, recognized an opportunity to cash in on Lattice's undervalued stock price by acquiring Lattice before it and its stockholders realized the impact of the Company's improving financial condition. As such, Canyon is in possession of non-public information regarding the performance of Lattice and is taking advantage of its position to acquire Lattice at a substantial discount to its true value.

6. Thus, the consideration being offered to Lattice public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Lattice common stock is materially in excess of the amount offered given the Company's recent financial performance together with its prospects for future growth and earnings.

7. Moreover, directors, executive officers and certain stockholders in the aggregate beneficially own nearly more than 10% of the outstanding Lattice shares and therefore, in order to ensure their lucrative, but invested, equity compensation packages are accelerated and cashed in, will influence the approval of the Merger.

8. To ensure the success of the Proposed Transaction, the Lattice Board locked up the deal by agreeing to impermissible "deal-protection" devices, effectively rendering the

[3] Additionally, the Company's non-GAAP operating expenses for the quarter were much higher due to a non-recurring bad debt expense.
[4] www.sec.gov/Archives/edgar/data/855658/000085565816000303/lscc2016q3ex-991er.htm.

Proposed Transaction a *fait accompli*. For example, the Board agreed to: (i) a non-solicitation provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision mandating that the Company inform Canyon of any competing offers, provided all information regarding a competing offer, and give Canyon four business days in which to match a competing offer that the Board determines is superior to the Proposed Transaction; and (iii) a $34,180,000 termination fee to be paid to Canyon if the Board agrees to a competing proposal, effectively deterring other potential suitors from making a superior proposal.

9. In pursuing the plan to facilitate the acquisition of Lattice by Canyon for grossly inadequate consideration, through a flawed process, the Defendants have violated Sections 14(a) and 20(a) of the Exchange Act by filing the Proxy with the SEC on January 27, 2017. The Proxy recommends that Lattice stockholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information which renders the Proxy Statement misleading.

10. Specifically, as more fully alleged below, the Proxy is false and/or materially misleading concerning the following: (i) the background of the Proposed Transaction; and (ii) the financial analyses of the Proposed Transaction performed by Morgan Stanley, Lattice's financial advisor.

11. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith and due care.

## JURISDICTION AND VENUE

12. Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. 17 C.F.R. § 240.14a-9.

13. The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Lattice is incorporated in this District.

## THE PARTIES

15. Plaintiff is, and at all relevant times was a shareholder of Defendant Lattice since prior to the wrongs complained of herein.

16. Lattice is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 111 Southwest 5th Avenue, Suite 700, Portland, Oregon 97204. Lattice's common stock is traded on the NASDAQ under the ticker symbol "LSCC." Lattice describes itself as follows on its website:

> Lattice Semiconductor provides smart connectivity solutions powered by our low power FPGA, video ASSP, 60 GHz millimeter wave, and IP products to the consumer, communications, industrial, computing, and automotive markets worldwide. Our unwavering commitment to our customers enables them to accelerate their innovation, creating an ever better and more connected world.

17. Defendant Darin G. Billerbeck ("Billerbeck") is President and Chief Executive Officer ("CEO") of Lattice. Billerbeck is and has been an executive and director of Lattice since 2010.

18. Defendant John E. Bourgoin ("Bourgoin") is and has been a director of Lattice since 2011.

19. Defendant Robin A. Abrams ("Abrams") is and has been a director of Lattice since 2011.

20. Defendant Brian M. Beattie ("Beattie") is and has been a director of Lattice since 2016.

21. Defendant Robert R. Herb. ("Herb") is and has been a director of Lattice since 2013. Herb is a partner in Scale Venture Partners, a venture firm focused on investments in information technology companies.

22. Defendant Mark E. Jensen ("Jensen") is and has been a director of Lattice since 2013.

23. Defendant David J. Richardson ("Richardson") is and has been a director of Lattice since 2014.

24. Defendant Frederick D. Weber ("Weber") is and has been a director of Lattice since 2015.

25. The Defendants above are collectively referred to hereinafter as the "Individual Defendants."

26. Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

27. Collectively, the Individual Defendants and Lattice are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

28. Plaintiff bring this action on his own behalf and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on behalf of all holders of Lattice common stock who are holders of record and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

29. This action is properly maintainable as a class action because:

(a) The Class is so numerous that joinder of all members is impracticable. As of November 10, 2016, Lattice had outstanding approximately 121,153,068 shares of Common Stock. Class members are believed to be geographically dispersed;

(b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(d) To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class

as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

30. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a) Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c) Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

## SUBSTANTIVE ALLEGATIONS

### A. Background

31. Lattice is a fabless semiconductor company. The Company's end-market industries range from consumer electronics to industrial equipment, communications infrastructure and licensing. The Company operates through two segments: the core Lattice business, which includes intellectual property and semiconductor devices, and Qterics, a software-as-a-service business unit in the Lattice legal entity structure. The Company offers three types of semiconductor devices, including Programmable Logic Device ("PLDs"), Video Connectivity application specific standard products ("ASSPs"), and millimeterWave devices.

32. The Company's PLDs are regular arrays of logic that can be custom-configured by the user through software. The Company offers four product family lines, which include The

ECP families, The MachXO families, iCE40 families and Programmable Mixed Signal devices. The Company's ECP families are its Connectivity & Acceleration field programmable gate arrays ("FPGAs"). They offer customers with Digital Signal Processing ("DSP") capability and Serialize-Deserialize (SerDes) connectivity. The Company's MachXO families are known as Bridging and Expansion FPGAs. Its iCE40 families are the small size and ultra-low power, which are the optimal products for customizing consumer mobile and industrial handheld products. Its Programmable Mixed Signal devices offer Platform Manger 2 and L-ASC10 combine programmable digital logic with analog functionality to help customers manage power, thermal, and control planes in real time.

33. The Company's Video Connectivity ASSPs performs various functions, including ensuring interoperability, enhancing picture quality, converting between resolutions, and transmitting/receiving content without the need for additional components. Specific device types include port processors, port controllers, video processors, transmitters, receivers, bridges, and converters. These devices are used in products, such as mobile phones, high-definition Television, home theater systems, automotive infotainment, personal computers, accessories, projectors and monitors.

34. The Company's mmWave Devices and modules allow customers to wirelessly transfer data and ultra-high-definition video content at gigabit speeds. Built using its 60 gigahertz SiBEAM technology, its mmWave transceivers, processors, and antenna arrays are divided into three groups, differentiated by their transmission range: Gigabit Connector, Gigabit Indoor and Gigabit Outdoor. Its Gigabit Connector devices eliminate the connectors on the mobile products. Its Gigabit Indoor devices and modules cut the wires in home, office, and factory. Its Gigabit

Outdoor products provide wireless fiber for network backhaul. Gigabit Outdoor products provide the communications market with speed links for point-to-point connectivity.[5]

35. The Company primarily sells its products to end customers directly or through its wholly-owned subsidiary, Lattice SG Pte. Ltd. Lattice sells directly and through a network of independent manufacturers' representatives. Additionally, the Company sells indirectly through independent sell-in (primarily Japan) and sell-through distributors. The Company also employs a direct sales management and field applications engineering organization to support end customers and indirect sales resources. The end customers are primarily original equipment manufacturers ("OEMs") in the Communications, Consumer and Industrial end markets.[6]

36. The Company acquired Silicon Image, Inc. ("Silicon Image") in March 2015. Silicon Image is engaged in setting industry standards including the HDMI®, DVI®, MHL® and WirelessHD® standards.

**B. <u>The Proposed Transaction and the Flawed Process</u>**

37. On November 3, 2016, Lattice and Canyon issued a joint press release announcing the Proposed Transaction which stated:

> PORTLAND, Ore. & PALO ALTO, Calif.--(BUSINESS WIRE)-- Lattice Semiconductor Corporation (LSCC) ("Lattice" or the "Company") and Canyon Bridge Capital Partners, Inc. ("Canyon Bridge") today announced that the Company and Canyon Bridge Acquisition Company, Inc. ("Parent"), an affiliate of Canyon Bridge, have signed a definitive agreement under which Parent will acquire all outstanding shares of Lattice for approximately $1.3 billion inclusive of Lattice's net debt, or $8.30 per share in cash. This represents a 30% premium to Lattice's last trade price on November 2, 2016, the last trading day prior to announcement.

---

[5] *See* www.reuters.com/finance/stocks/companyProfile?rpc=66&symbol=LSCC.O.
[6] www.sec.gov/Archives/edgar/data/855658/000085565816000180/a201510-k.htm#s7BF32324A4ED5B888F0986DE8AC4D067.

> Darin G. Billerbeck, President and Chief Executive Officer of Lattice, commented, "We are pleased to announce the transaction today with Canyon Bridge, which will unlock tremendous value for shareholders. This transaction is the culmination of an extensive review process with our Board, financial and legal advisers, and it delivers certain and immediate cash value to shareholders while reducing our execution risk. We are excited to leverage Canyon Bridge's resources and market connections as we enhance our focus on executing our long-term strategic plan of continued innovation. Importantly, we will operate as a standalone subsidiary after the acquisition and do not expect any changes in our operations or our unwavering commitment to continued innovation for our customers."
>
> Ray Bingham, Founding Partner, Canyon Bridge, noted, "Lattice's low-power FPGA franchise, along with its video connectivity and wireless solutions, make it a compelling, strategic investment. We expect the Company will continue to leverage its existing customer relationships with major OEMs globally, while further broadening the role of its technology solutions and accelerating its strategic plans."
>
> Benjamin Chow, Founding Partner, Canyon Bridge, added, "Equally critical in our decision to partner with Lattice is the Company's world-class management team and its dedicated, highly experienced employee base. Our long-term interests are aligned with Lattice's employees and customers. We plan to build upon Lattice's achievements and are excited to provide the resources necessary to help the Company achieve significant growth and long-term success."
>
> The transaction has been unanimously approved by both companies' boards of directors and is expected to close in early 2017 subject to customary closing conditions, regulatory approvals and approval by Lattice's shareholders. Lattice and Canyon Bridge are committed to proactive engagement with regulators to facilitate the government review process.
>
> Upon the completion of the transaction, Lattice will be a standalone subsidiary of Canyon Bridge and Lattice's senior management team will continue to lead the business from its current headquarters in Portland, OR.[7]

38. The process that led to the Proposed Transaction was flawed from the beginning. As described in the Proxy, beginning in the summer of 2015, Chinese-based private equity firms (called "financial sponsors" in the Proxy) began reaching out to Lattice representatives about a potential transactions. Thus, in June 2015, a China-based financial sponsor ("Party A"),

[7] www.sec.gov/Archives/edgar/data/855658/000119312516758079/d277254dex991.htm.

contacted Abid Ahmad ("Ahmad"), a man merely described as "a senior advisor to Lattice in connection with strategic transactions," and informed him that Party A was interested in meeting with Lattice to discuss a potential strategic transaction involving Lattice and Party A. Proxy at 36. Although Ahmad was intimately involved in every aspect of the sales process, the Proxy fails to provide any information about Ahmad, including whether he is on Lattice's payroll, whether he owns stock in the Company, or whether he is affiliated in any way with the bidders described in the Proxy, or with Canyon.

39. Later in June, 2015, Party B, another China based financial entity contacted Lattice about a potential transaction. Lattice and Party B met on several occasions through October 2015. Proxy at 36-37.

40. In July, 2015, Lattice and Party A entered into a nondisclosure agreement ("NDA") that contained a nine-month standstill provision that fell away if Lattice entered into a transaction.. Lattice and Party A engaged in meetings and discussions through September, 2015. Proxy at 36-7. Party B entered into an NDA with Lattice with the same term on October 23, 2015.

41. On August 6, 2015, the Board held a meeting and discussed Lattice's financial performance and prospects, including recent revenue shortfalls as compared to internal forecasts, and potential cost saving measures. Proxy at 37.

42. Between early August and early November 2015, the Individual Defendants and Ahmad held follow-up meetings and advanced discussions with representatives of Party and Party B. Ahmad indicated that Party A was soliciting investor to provide necessary financing. Proxy at 37.

43. On November 5, 2015, the Board held a meeting and discussed Lattice's financial performance and prospects, including, among other things: financial projections for 2015 and subsequent years; potential cost cutting measures, Lattice's strategic position, options, and the possibility of a transaction. Proxy at 38.

44. During this meeting, a prospective financial advisor made a presentation to the Board regarding the strategic landscape of the semiconductor industry and potential interest from buyers in China in acquiring semiconductor companies. The prospect that a transaction with a China-based buyer may require approval from Committee on Foreign Investment in the United States ("CFIUS") was raised. The Board authorized Billerbeck to continue discussions with Party A and Party B. Proxy at 38.

45. On December 2, 2015, Ahmad met with Party B and learned for the first time that Parties A and B planned to submit a joint proposal. The joint Party A and B proposal was made on December 11, 2015 at a range of $8.00 to $8.50 in cash per Lattice share and they asked for exclusivity. Proxy at 38.

46. At the December 21, 2015 Board meeting, the Board decided to engage Morgan Stanley as the Company's financial advisor and created the Strategic Alternatives Committee, (the "SAC"), which was tasked with evaluating strategic options for Lattice. Later in December, Morgan Stanley identified Parties C and D, domestic strategic entities as potential acquirers of Lattice. Proxy at 39. Morgan Stanley later contacted Parties C and D. Proxy at 40.

47. From late December 2015 to on or about January 11, 2016, the Board, the SAC, and Morgan Stanley, continued negotiations with Parties A and B, but declined to grant exclusivity and explored alternative transactions.

48. Between January 12 and January 19, 2016, the Board, the SAC, Ahmad, and Morgan Stanley fielded and gauged offers from five additional potential bidders, including Party F, a European strategic entity, and Party G, a U.S. strategic entity. During this time, Lattice received a revised proposal from Party A and Party B of $9.00 per share, though this proposal was within about a month revised lower to around $8.00 per share. The Proxy does not disclose the basis for Parties A and B reduction of their joint proposal, though the Proxy does disclose they needed more time to raise the financing for transaction. Proxy at 40. By January 21, 2016, Parties A and B had backed out of the process. Proxy at 41. The Proxy fails to disclose the reason why Parties A and B terminated discussions with Lattice.

49. On January 19, 2016, Lattice and Party C entered into an NDA that imposed a 12-month standstill period. The Proxy does not disclose whether Party D, Party F, and Party G individually entered into an NDA. Proxy at 41.

50. The same day, representatives of Party G informed Morgan Stanley that Party G was not interested in pursuing a transaction involving Lattice due to alternate corporate priorities. Proxy at 42.

51. On February 2, 2016, Party C informed Morgan Stanley that Party C was not interested in pursuing a transaction with Lattice. The Proxy does not disclose why Party C declined to pursue a transaction. Proxy Statement at 42.

52. Days after expressing interest in the Company, on February 5, 2016, Party H, a China-based strategic entity, submitted a non-binding indication of interest to purchase all of the outstanding stock of Lattice for $9.00 per share in cash, which offer was contingent upon Party H's ability to find sources to help finance the proposed transaction and satisfactory completion of customary due diligence. Proxy at 42.

53. Between February 5 and February 9, Billerbeck and Morgan Stanley continued discussions with Party D and Party H. During this time, Party H signed an NDA with a 12-month standstill period. Party D refused to sign the form of NDA Lattice used during the sales process. Proxy 42-3.

54. On February 12, 2016, Party H submitted a proposal to acquire Lattice for $9.00 in cash per Lattice share, with a three-week deadline to demonstrate progress towards obtaining committed financing and the completion of diligence. Lattice later provided access to the diligence materials gathered in the online data room to the representatives of Party H, and continued to provide them with additional diligence materials. Party H's ability to obtain financing for a transaction was an issue for the Board and was discussed at Board meetings. Proxy at 43.

55. On February 29, 2016, Party D backed out of further discussions with Lattice about a potential transaction. Proxy at 43.

56. On April 8, 2016, a representative of Lazard Freres & Co. LLC ("Lazard"), financial advisor to China Reform Fund Management Co., Ltd., a China-based financial sponsor and affiliate of Caynon's parent company, China Venture Capital Fund Corporation Limited ("CVC"), approached Morgan Stanley and indicated that Party J would be interested in discussing a potential strategic transaction involving Lattice. Proxy at 44.

57. During the month of April 2016, Party H and Lattice negotiated the terms of a proposed merger agreement. Proxy at 44.

58. On April 13, 2016, Tsinghua Unigroup International Co., Ltd., ("Tsinghua") filed a Schedule 13-D disclosing that it had acquired ownership of approximately 6% of Lattice's

outstanding common stock. Tsinghua relationship and the nature of its influence in the Proposed Transaction and bidding process is undisclosed in the Proxy. Proxy at 44.

59. On April 27, 2016, Lattice and Party J entered into an NDA with a 12-month standstill period. Proxy at 44.

60. The Proxy discloses that Party H had a difficult time retaining a financial advisor regarding a potential transaction with Lattice, as new financial advisors were engaged by Party H throughout. Ultimately, on May 2, 2016, Lattice decided to discontinue negotiations and the provision of additional due diligence materials to Party H. Party H would not reenter negotiations again with Lattice as it was not able to demonstrate progress with financing. Proxy at 45-6.

61. After an initial balk in January 2016, Party E reentered the picture on May 3, 2016 and indicated that it would be interested in a strategic transaction, but expressed concerns over the required CFIUS approval for such a transaction. Proxy at 45.

62. On May 5, 2016, Billerbeck, Ahmad, and representatives from Morgan Stanley discussed with Benjamin Chow, a representative of Party J, Lattice's business and the possibility of a strategic transaction. Proxy at 45.

63. On May 17, 2016, Lattice and Party E entered into an NDA with a 12-month standstill period. Proxy at 46.

64. Billerbeck and Lattice senior management met with representatives for Party E, Party K and Party J in China on May 20, 2016. Party E expressed doubt over whether they could offer a satisfactory price. Party E and Party J expressed unwillingness to entertain any form of reverse termination fee that would be payable to Lattice in the event CFIUS approval was not

obtained. Another entity that was contacted, Party K indicated did not want to discuss a potential transaction with Lattice altogether. Proxy at 46.

65. Party F informed Morgan Stanley on May 26, 2016, that it was not interested in pursuing a potential transaction with Lattice. The Proxy does not disclose the reason for the discontinuance of negotiations. Proxy at 46.

66. On July 7, 2016, Party J submitted a proposal to acquire all the outstanding shares of Lattice for $8.00 per share in cash. The proposal contemplated that Lattice and Party J would jointly approach CFIUS as part of the diligence process. Proxy at 47.

67. Party J submitted a revised proposal to acquire Lattice for between $8.75 and $9.00 in cash per share. Furthermore, Lattice and Party J would enter into an exclusivity agreement until September 15, 2016 in order to incentivize Party J to complete the transaction within a short timeframe. Proxy at 47.

68. At an August 5, 2016 Board meeting, members of Lattice senior management and Morgan Stanley discussed Lattice's standalone business, including Lattice’s updated internal management forecasts and the risks associated with achieving those forecasts. These projections were subsequently provided to Morgan Stanley for purposes of its valuation analysis. A subset of this data was provided to Canyon. At the conclusion of the meeting, the Board resolved to enter into an exclusivity arrangement with Party J to pursue active negotiations. Billerbeck, Ahmad, and Chose also reviewed the updated forecasts with Morgan Stanley on August 12, 2016. Proxy at 48.

69. On August 8, 2016, Lattice and Party J entered into an exclusivity agreement pursuant to which Lattice agreed not to initiate or facilitate discussions regarding a potential strategic transaction with any third party through August 21, 2016. Party J could option to extend

the date through to September 21, 2016 by confirming its preliminary valuation range of $8.75 and $9.00 prior to August 21, 2016. Proxy at 48.

70. Party J submitted a revised proposal on August 21, 2016, which provided for a purchase price of $8.30 in cash per share of Lattice common stock and was contingent on an extension to the exclusivity period to September 12, 2016. Proxy at 49.

71. The next day, Lattice, Party J and Morgan Stanley discussed Party J's revised proposal. Chow stated that, after discussions with Party J, he was considering leaving Party J to form a new private equity fund (Canyon), which CVC had agreed to invest in. In light of their inadequate proposal, Party J's exclusivity had lapsed, and the SAC discussed potential outreach to other bidders. Proxy at 49.

72. After authorizing Morgan Stanley to restart solicitation of potential bidders on August 26, 2016, Morgan Stanley reengaged Party C, Party D, Party E and Party L in various degrees later that month. At this time, Morgan Stanley also contacted Party M, Party N, Party O and Party P. Proxy at 49-50.

73. On September 1, 2016, Lattice and Party P entered into an NDA that imposed a six-month standstill period. Proxy at 50.

74. On September 2, Chow was now in the process of forming Canyon and, with CVC's funding, would seek to effect a transaction with Lattice. Morgan Stanley expressed to Lazard that Lattice would not consider exclusivity with Canyon until there was clarity as to Canyon's structure and financing. Proxy at 51.

75. Between September 2 and September 3, 2016, Party D, Party N and Party M all indicated to Morgan Stanley that they were not interested in pursuing a transaction with Lattice. The Proxy does not disclose why Party D and Party N discontinued their pursuit. Proxy at 51.

76. On September 6, 2016, Lattice and Party L entered into an NDA that imposed a six-month standstill period. Proxy at 51.

77. On September 6, 2016, and again on September 7, 2016, Ahmad and representatives of Morgan Stanley met with Chow and discussed the proposed structure of Canyon and its funding commitments. Proxy at 51.

78. On September 10, 2016, Canyon submitted a non-binding proposal to acquire all of the equity interests of Lattice for $8.30 per share in an all-cash transaction. This transaction would be contingent upon final approval from Canyon's investment committee and an exclusivity agreement between Canyon and Lattice by September 13, 2016. Proxy at 52.

79. Party C, Party O and Party P indicated to Morgan Stanley that they were not interested in pursuing a transaction with Lattice between September 11 and September 12, 2016. The Proxy does not disclose why Party C and Party O discontinued their pursuit. Proxy at 52.

80. On September 12, 2016, Party L submitted a proposal to acquire Lattice at a significantly lower price than the offer from Canyon. The Proxy fails to disclose the price offered by Party L. Proxy at 53.

81. On September 13, 2016, after reviewing Party L's proposal and the lack of activity from other bidders, Lattice entered into a new exclusivity agreement with Canyon that lasted to October 4, 2016 (that would automatically extend to October 18, 2016), and instructed the SAC to supervise the negotiation of the definitive agreement with Canyon. The Proxy Statement does not disclose why the Board failed to reach out to other bidders prior to entering into the exclusivity agreement with Canyon. Proxy at 53.

82. On September 21, 2016, Party E sent Morgan Stanley an executed copy of Lattice's NDA. Party E also reached out on September 22, 2016. Morgan Stanley did not

respond to Party E pursuant to Lattice's obligations under the exclusivity agreement with Canyon. Proxy at 54.

83. On October 18, 2016, the SAC held a meeting, with Bourgoin and Billerbeck, other members of Lattice senior management and Morgan Stanley. The SAC discussed key remaining issues in the proposed merger agreement in light of additional drafts which had been exchanged over the course of the preceding week. Morgan Stanley noted that Canyon had provided evidence that it had $1.4 billion in financing commitments from a wholly owned subsidiary of CVC. The SAC also discussed the management forecasts and approved use of the management forecasts discussed on August 31, 2016 by Morgan Stanley for its valuation analysis. Canyon was granted with enhanced exclusivity three times through October 26, October 28 and November 3, 2016, respectively. The Proxy does not disclose why the total valuation of the deal dropped by $100 million to $1.3 billion. Proxy at 55-6.

84. On October 21, 2016, Billerbeck and Chow discussed the fact that Canyon intended to retain Lattice's senior management post-closing. The two discussed plans to implement a retention plan for employees post-transaction, although no specifics were discussed at this time. Proxy 56.

85. On October 28, 2016, Lattice agreed to extend the Canyon exclusivity period through November 2, 2016. Proxy at 57.

86. At a November 2, 2016 Board meeting, after a presentation by Morgan Stanley of its evaluation of the Proposed Transaction, including the valuation methodologies employed, that supported its opinion that the Proposed Transaction was fair from a financial point of view ("Fairness Opinion"), the Board voted to approve the Proposed Transaction and on November 3, 2016, the Company executed the Merger Agreement and all ancillary documents. Proxy at 58.

C. **The Proposed Transaction Undervalues Lattice's Shares**

87. The per share consideration being offered to Lattice public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Lattice's common stock is materially in excess of the amount offered given the Company's recent financial performance together with its prospects for future growth and earnings.

88. As alleged above, Lattice's results have improved dramatically in recent quarters. For the second fiscal quarter ended July 2, 2016, the Company reported revenue for the second quarter of 2016 of $99.2 million, which increased 2.8% sequentially, as compared to the first quarter 2016 revenue of$96.5 million. GAAP net loss for the second quarter was $13.8 million ($0.12 per basic and diluted share), with net income of $0.2 million ($0.00 per basic and diluted share) on a non-GAAP basis. This compared to a net loss on a GAAP basis in the prior quarter of $19.7 million ($0.17 per basic and diluted share), with a net loss on a non-GAAP basis in the prior quarter of $0.9 million ($0.01 per basic and diluted share).

89. Defendant Billerbeck was very optimistic of the Company's prospects:

> We are excited that we exited the second quarter of 2016 with FPGA shipments of greater than 1 million units a day. Revenue for the second quarter came in as expected with gross margin slightly above the high-end of expectations. Non-GAAP operating expenses in the second quarter decreased sequentially but were approximately $2.0 million above the high-end of guidance, as short term variable spending was higher than anticipated. In the third quarter of 2016, we expect double-digit revenue growth along with double-digit reductions in spending. We remain encouraged by the increased traction in our FPGA business, continued success in the broader consumer market with both FPGAs and Imaging products, as well as growth in our industrial and licensing businesses.[8]

90. Max Downing, Interim Chief Financial Officer, added,

---

[8] http://ir.latticesemi.com/phoenix.zhtml?c=117422&p=irol-newsArticle&ID=2194282.

> Second quarter of 2016 gross margin was 58.9% on a GAAP basis and 59.1% on a non-GAAP basis, reflecting increased IP royalties and license revenues. We continue to expect gross margin for the full year 2016 to be more in-line with our long-term, mid-50's percent target, as our consumer business is beginning to ramp significantly. We finalized our sale of Qterics in the second quarter and recognized a gain of $2.6 million in our GAAP results. We ended the second quarter with $119.3 million in cash and short term investments after $9.5 million in cash flow provided by operations, and as compared to a balance of $116.5 million at the end of the prior quarter.[9]

91. These second quarter results (and the first quarter described above) are in line with Billerbeck's forecast for the year:

> As we said in February, we expected the first quarter to represent a low point in revenue for the year, followed by a healthy uptick in the second half of 2016, which puts us firmly on track to outpace expected overall industry growth. We are in execution mode with increased visibility into the planned second half ramp of wins at major consumer OEMs. Since we introduced our consumer mobile FPGAs 5 years ago, all of the key Consumer Mobile OEMs have embraced these products to bring leading edge innovation to market. We also are benefiting from diversification of Greenfield markets, as we build on the high value, high performance proposition only Lattice is delivering to customers. These broad market growth opportunities range from ASIC replacements, to wins in automotive, to a wide variety of imaging and entertainment applications, newer wearable devices, IoT and smart home application wins. All of which are in-line with our vision of accelerating customer innovation for a better connected world.[10]

## D. The Preclusive Deal Protection Devices

92. Despite Lattice's prospects for future profitability and growth Defendants chose to sell the Company only to Canyon and agreed to onerous deal provisions and other agreements to ensure a sale only to Canyon. These onerous and preclusive deal protection devices operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

---

[9] *Id.*

[10] http://ir.latticesemi.com/phoenix.zhtml?c=117422&p=irol-newsArticle&ID=2166515.

93. The Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize stockholder value, including soliciting alternative acquisition proposals or business combinations.

94. Specifically, Section 5.02(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by Canyon. The Company also must terminate any and all prior or existing discussions with other potential suitors. Section 5.02(a).

95. Additionally, Sections 5.02(c) and 5.02(g) of the Merger Agreement grants Canyon recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four (4) business days to negotiate with Lattice, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received. Section 5.02(c) requires the Company to notify Canyon within 24 hours that it has received an inquiry, proposal or offer. To further suppress any efforts by potential bidders to even reach out to the Company, section 5.02(a) prohibits the Company from releasing any third parties from any existing standstill and/or confidentiality commitments.

96. To further ensure the success of the Proposed Transaction, the Board locked up the deal by agreeing to pay a termination fee of $34,180,000 million. Section 8.02(b). The terms of the Merger Agreement essentially requires that the alternative bidder agree to pay a naked premium for the right to provide Lattice's stockholders with a superior offer.

97. These provisions cumulatively discourage bidders from making a competing bid for the Company.

## E. The Incomplete & Materially Misleading Proxy Statement

98. On November 30, 2016, Lattice filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy fails to provide the Company's stockholders with material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed by Morgan Stanley. As a result of the incomplete and misleading Proxy, Lattice's stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction.**

99. The Proxy fails to provide material information concerning the process conducted by the Board, the SAC and Morgan Stanley and the events leading up to the signing of the Merger Agreement. In particular, the *Background of the Merger* and *Recommendation of the Board of Directors and Reasons for the Merger* sections contained on pages 58-62 of the Proxy is materially deficient in that it fails to disclose the following information:

(a) The identity of Abid Ahmad, his role with the Company, whether he has any equity and/or other financial interest in the Company, in Canyon, in any of the entities engaged during the sales process described in the *Background* section of the Proxy, what his

compensation is for advising on the Proposed Transaction, and/or any other actual or potential conflicts of interest with the Proposed Transaction (Proxy, 36);

(b) The rationale given by those entities that refused to engage in due diligence and/or terminated negotiations with Lattice regarding a potential transaction;

(c) The reason that certain of the standstill provisions' duration was 12 months while others were for 6 months, and whether the standstill contained a "don't ask don't waive" provision that prohibited a bidder from contacting Lattice to increase its bid (Proxy, 36);

(d) Clarification of the "recent design win with a key customer" that was discussed by the Board at board meetings and the impact on the Company's financial forecast (Proxy, 39);

100. The omission of the above information renders statements in the Proxy "Background of the Merger" and "Reasons for the Merger and Recommendation of the Board of Directors" sections false and/or materially misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Propose Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange their shares are thus threatened with irreparable harm warranting the injunctive relief sought herein

**Materially Incomplete and Misleading Disclosures Concerning Lattice's Financial Information and Banker Analysis**

101. The Proxy fails to properly and adequately disclose to Lattice's non-public projected financial data and/or assumptions relating to the Company's future performance. The

Proxy makes clear, that both the Board and Morgan Stanley relied continuously throughout the sales process on this information to reach a decision to enter into the Merger Agreement with Canyon and that the Board relied on this information to recommend that Lattice stockholders vote in favor of the Proposed Transaction for the Merger Consideration. The omission of this information renders the Proxy false and/or misleading as this information was relied on and utilized by the Board and Morgan Stanley. This omission renders the Proxy false and/or misleading as this information was relied on and utilized by the Board and Morgan Stanley.

102. The Proxy fails to disclose certain material information regarding Morgan Stanley's *Precedent Transactions Analysis*. Specifically, although Morgan Stanley reviewed nearly forty (40) transactions, the Proxy fails to disclose specific, a mean, or a median multiples for the following observed metrics for the transactions evaluated: (i) last twelve month ("LTM") or next twelve month ("NTM") revenue multiples, (ii) LTM and NTM EBITDA multiples, or (iii) LTM or NTM price to earnings. Rather, the Proxy discloses only that Morgan Stanley performed this valuation based on its "selected representative range of multiples." This information is material to Lattice's stockholders because Lattice's stockholders are unable to determine how the multiples used in determining Lattice's value compare to the multiples from the selected transactions. Proxy at 71-72. Lattice's stockholders are entitled to this information in order to determine Lattices' true value. Thus, the omission of the individual selected transaction multiples, or even a median or mean of the multiples used, render this analysis and the "implied present value per share of the company common stock" ranges misleading.

## COUNT I

**On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act**
**Against the Company and the Individual Defendants**

103. Plaintiff repeats and realleges each allegation set forth herein.

104. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

105. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

106. Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth *supra*. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

107. The misrepresentations and omissions in the Proxy are material to Plaintiff who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

108. Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT II

**Claims for Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

109. Plaintiff repeats and realleges each allegation set forth herein.

110. The Individual Defendants acted as controlling persons of Lattice within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Lattice, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

111. Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

113. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy Statement purports to describe the various issues and information that the Individual

Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

114. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

115. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

116. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A. Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative and his counsel as Class Counsel;

B. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

C. Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED: January 27, 2017

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: s/ *James R. Banko*
James R. Banko (Bar ID No. 4518)
Michael Van Gorder (Bar ID No. 6214)
20 Montchanin Road, Suite 145
Wilmington, Delaware 19807
(302) 482-3182
Email: jbanko@faruqilaw.com
Email: mvangorder@faruqilaw.com

*Attorneys for Plaintiff*

**OF COUNSEL**

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Ph. (212) 971-1341
Cell (646) 522-4840
email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*